IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2007 AUG -2  P 3: 56

U.S. DISTRICT COURT
DISTRICT OF MASS.

Civil No. _____

|  |  |
|---|---|
| GE CAPITAL LEASING CORPORATION, ) | |
| ) | COMPLAINT CHARGING |
| Plaintiff, ) | RICO VIOLATIONS, COMMON |
| ) | LAW FRAUD AND NEGLIGENT |
| ) | MISREPRESENTATION AGAINST |
| PARAMETRIC TECHNOLOGY ) | PARAMETRIC TECHNOLOGY |
| CORPORATION, ) | CORPORATION |
| ) | |
| Defendant. ) | Plaintiff demands a jury on all issues |
| ) | so triable, pursuant to Rule 38 Fed.R. |
| ) | Civ. Pro. |
| ) | John J.E. Markham, II |

Plaintiff GE Capital Leasing Corporation (hereinafter "GELC") for its Complaint

against the defendant Parametric Technology Corporation (hereinafter "PTC") alleges as

follows:

## ALLEGATIONS RELATING TO ALL COUNTS

### Nature of This Action

1.      GELC, a financial services company based in Tokyo, Japan, brings this

action against PTC, an international software manufacturer and distributor based in

Needham, Massachusetts, to recover at least $47,000,000.00 in damages (which should

be trebled and be accompanied by an award of attorneys fees), and which were sustained

by GECL as a direct result of being injured in its business and property (i) by various

predicate acts of wire fraud by PTC and other participants amounting to violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962 et

seq.), (ii) by common law fraud, and (iii) by various negligent representations by PTC

that caused GECL to rely to its detriment on said misrepresentations. Some of the acts of fraud, and knowingly false representations referred to herein were committed by PTC and its subsidiaries, including PTC Japan, Inc. (PTC's Japanese subsidiary and agent), along with other scheme participants, including certain employees at Toshiba Corporation, Japan ("Toshiba"), a large, international manufacturing company, based in Japan but operating under the authority of various group companies throughout the world; and certain Japanese software dealers.

      2.      As explained in more detail below, commencing in or around 2003, PTC—through the use of interstate and foreign Internet wire, radio and telephone communications—engaged in a scheme or artifice to defraud, and to obtain GELC's money and property by false and misleading pretenses, representations and pretexts and knowingly made and caused to be made a series of false and misleading representations, and concealed and caused to be concealed material facts, all with the intent to fraudulently induce GELC to finance what PTC and others falsely represented to be a series of large purchases and deliveries of PTC and other software. These purchases were purported to be made by Toshiba, which PTC and the other fraud participants falsely represented had agreed to repay the financing to GELC by installment payments. In truth, and as PTC well knew, Toshiba never authorized or made these purchases, and little if any software was delivered to Toshiba under the agreements. The small amount of software actually delivered to Toshiba was provided under false pretenses to satisfy other, separate Toshiba purchases of PTC software (the funds Toshiba used to pay for these separate purchases were secretly used by the fraud participants to pay off earlier financing debts). PTC and other fraud participants fabricated the delivery of software to

Toshiba to induce GELC to continue to finance the purported purchase o fabricated delivery of software to Toshiba, and PTC and other fraud participants received and recorded at least $47,000,000.00 of this money. In other words, as a result o GELC's reliance on the fabricated deliveries GELCwas damaged in an amount of at least $47,000,000.00.

3.      GELC discovered that it had financed these fraudulent software purchases from August 1993 through October 2006 and has demanded that PTC repay the monies it received from the GELC financing. PTC has refused to do so, and GELC thus brings this action.

## Jurisdiction

(a) Count I and II (federal question):

4.      This Court has subject matter jurisdiction over Counts I and II pursuant to 28 U.S.C. § 1331 (federal question) since these causes of action arise under 18 U.S.C § 1962, (RICO).

(b) All Counts (diversity of Citizenship) between GECL and PTC:

5.      This Court has subject matter jurisdiction over all Counts set forth in this Complaint under 28 U.S.C. § 1332(a) (2) (diversity of citizenship) because plaintiff GECL is a citizen of Japan, PTC is a citizen of the States of Massachusetts, and the amount in controversy exceeds $75,000.00 exclusive of interests and costs.

## Venue

6.      Venue is proper in this District under 28 U.S.C. § 1391 (b) because defendant PTC, having its principal place of business in Needham, Massachusetts, is found within this District, a substantial part of the events or omissions giving rise to the

3

claim occurred within this district, and a substantial part of the property that is the subject of this action is situated in this district.

## The Parties to this Action

7. Plaintiff GELC, among other things, uses its funds to finance the purchase of manufacturing and design equipment and software for its customers in exchange for the customer's agreement to repay those funds with interest. GELC's customers, once they have taken delivery of the equipment and software, repay the GECL-sponsored financing over time in the form of periodic installment payments made to GELC.

8. Defendant PTC and its subsidiaries (hereinafter "PTC"), among other things, develop, market, sell and maintain worldwide sophisticated and costly, high-technology software products, including the software that is the subject of this Complaint. PTC's worldwide operations, including those of its subsidiaries, are controlled and directed from its headquarters in Needham, Massachusetts, within this District. PTC acts in Japan sometimes directly and sometimes through instructions and directives it gives to its wholly-owned Japanese subsidiary, PTC Japan, which is controlled by PTC and which acts for PTC's benefit and on its behalf.

9. Other scheme participants acted as joint tortfeasors in concert with PTC in relation to the wrongs alleged in this Complaint and were acting, at least in part, to benefit PTC. Like PTC, these other fraud participants well knew that the supposed sales to Toshiba were in fact not made and that the monies advanced by GELC to pay for these fake sales were instead paid to PTC and others without consideration. PTC is therefore liable for the actions of these other fraud participants acting in concert with it.

4

## PTC's CAD Technology

10.     PTC manufactures and distributes computer software products, including computer-aided design ("CAD") and computer-aided manufacturing ("CAM") software. CAD is the use of a wide range of computer-based tools that assist engineers, architects and other design professionals in their design activities. Integrating CAM with CAD produces a more efficient manufacturing process. This methodology (CAD-CAM) is applied in different manufacturing applications. In many such applications, the CAM system will work with a CAD design made in a three-dimensional image, literally giving a new and useful dimension to aid in the more efficient manufacture of a product.

11.     Toshiba, a large diversified and worldwide manufacturer, uses this CAD-CAM software in many of its design processes. The transactions referred to in this Complaint involved primarily the CAD software.

12.     The purchase and use of the PTC CAD-CAM software requires, among other things, a CD-ROM disk on which the software is stored, or, alternatively, access to a computer server on which the software is stored and from which a purchaser can retrieve the software. To install and maintain the software, a customer, having purchased the CAD-CAM software, uses the Internet wire, radio and satellite connections established in interstate and foreign commerce to communicate by computer from Japan to the United States and to Needham, Massachusetts. For the software to be operable, however, the purchaser must not only obtain the software, but also obtain and employ a license code. These codes allow the purchaser to access, install, register, maintain and use the CAD-CAM software it has purchased. Without these, the software cannot be used.

13.     PTC maintains and administers these license codes on computer servers located in, and controlled from, its headquarters in Massachusetts.

14.     These codes are indispensable to the profitability of CAD-CAM software. Without the requirement of a separate code to install, register, maintain and operate each copy of CAD-CAM software sold by PTC, the software, once purchased, could be copied, installed and used in as many computers as desired by the customer such that the purchase of one such program would meet all the needs of a customer or a group of customers. This would eliminate any need for multiple software purchases in many circumstances and thus deprive PTC of the profit that would have been generated by the purchase of one program per computer. Accordingly, the software was designed so that it cannot be installed or used without a separate and distinct license code. This assures that a purchaser seeking to install the software on more than one computer will purchase the full number of programs it desires rather than buying only one program and using it multiple times.

15.     To acquire the needed license code, a customer in Japan or elsewhere, having purchased the CAD-CAM software uses the Internet wire, radio and satellite connections established in interstate and foreign commerce to communicate by computer from Japan to the United States and to Needham, Massachusetts, among other places, to access and obtain the license code, which is maintained in the United States and operated and controlled by defendant PTC in Needham, Massachusetts. Not only is the licensing code system activated and controlled from PTC's headquarters in Needham, servicing, maintenance and control over the software, emanate from the Needham headquarters.

6

## Toshiba and the PTC Software

16.     Toshiba is a very large and diversified international company operating

worldwide and engaged in the design and manufacture of many different types of

products, such as equipment, industrial machines, household goods and appliances, and

computer technologies, among others. The appropriate purchase and use of high-

technology design and manufacturing software therefore is of critical importance to

Toshiba in numerous locations where Toshiba engages in design and manufacturing.

17.     Mr. Kazuo Takahashi ("Takahashi") was at all relevant times a

managerial-level employee of Toshiba entrusted with the responsibility to implement

design rationalization measures, consistent with the needs stated in this Complaint, for

the entire company of Toshiba and its group companies; and, at Toshiba's direction and

instruction, Takahashi was directed to streamline and integrate Toshiba's acquisition and

use of design software.

18.     With these important responsibilities, Takahashi possessed the ability to

engage with PTC in the fraud described below. Using this ability, Takahashi, PTC and

the other scheme participants concocted 11 large but fraudulent software purchase

transactions and induced GELC to advance in excess of $62,000,000.00 to finance these

fraudulent transactions. A summary of these transactions is annexed to this complaint as

Schedule "A."

## The Scheme to Defraud GELC

19.     This scheme started prior to GELC's involvement when, in about late

2000, Takahashi decided that the appropriate software for streamlining Toshiba's design

7

software use would be the CAD software manufactured by PTC that had been used by the

designing department for the main products of the Toshiba Group. In discussions with

PTC, PTC proposed a plan for Toshiba to procure PTC CAD software (which was

extremely expensive at the time) at a price much lower than the regular price, by having

Toshiba purchase it in bulk from PTC. In about 2001, Takahashi proposed these bulk

purchases to Toshiba, but was unable to obtain approval. Instead, Toshiba group

companies continued purchasing the software only in small amounts and at times when it

was needed.

20.    Having failed to obtain Toshiba's approval to purchase PTC software in

bulk, Takahashi and PTC approached Sumitomo Metal System Solutions Co., Ltd.

("Sumitomo Solutions"), a software dealer. After discussions, Sumitomo Solutions

agreed to conduct a purchase-in-bulk transaction to procure a large quantity of PTC

software and hold such software as its "inventory" for the purpose of later making

smaller individuals sales to Toshiba on an as-needed basis. When a Toshiba Group

company placed an individual purchase order for PTC software with Sumitomo Solutions,

PTC would provide the software license codes for each individual purchase directly to

that Toshiba group company. PTC arranged for a leasing company, SMBC Leasing

Company ("SMBC"), to finance the Purchase-in-Bulk by Sumitomo Solutions. To repay

SMBC Leasing Company for the monies it had advanced, Sumitomo Solutions pooled

the sales proceeds it received from Toshiba on individual software orders and used those

funds to make the instalment payments to SMBC Leasing Company as those instalment

payments became due. By doing so, the participants concealed the existence of the bulk

purchases and financing agreements from Toshiba. However, over time these bulk sales

also created a large inventory of unused CAD software that was held by scheme participants and which Toshiba group companies would purchase in individual quantities sufficient to allow the fraud participants to continue to make the instalment payments on the bulk sale as they became due.

21.     In or about 2002, the individuals employed by Sumitomo Solutions who operated the purchase-in-bulk program described above, left Sumitomo Solutions and joined Transcosmos, Inc., which the scheme participants agreed would assume the role of the buyer in the purchase-in-bulk plan. PTC, Takahashi and Transcosmos agreed that Transcosmos would replace Sumitomo Solutions as the party purchasing software directly from PTC, and it would further sell this software in bulk to Toshiba. They further agreed that these purchases would be financed by funds advanced by a leasing company. Use of a leasing company allowed PTC's CAD software to be purchased in bulk with the funds advanced by the leasing company under the pretext that these monies were going to be used to purchase software for Toshiba and that Toshiba would repay the advance by making the lease payments. In furtherance of this scheme, and to induce the leasing company into believing that he was authorized to make the purchases involved, when in fact he was not, Takahashi entered into agreements in the name of Toshiba, sometimes fraudulently using the purported authority of his title as "IS Center Group Leader: Kazuo Takahashi," and as sometimes using a forged (referred to in Tokyo as a "chop") stating "Makoto Degawa (Chief of Toshiba's IS Center Engineering System Department)." These false representations made it appear to the leasing company that Toshiba was in fact willing to make the bulk purchases involved from PTC and PTC's sales agent.

9

22. Since these bulk sales and deliveries to Toshiba were not in fact made, and indeed Toshiba did not know that its name was being used in this scheme as the supposed bulk-software buyer, Toshiba did not make the repayments. Rather, under this scheme, the advanced monies, while said to be coming from Toshiba as lease payments, in fact came from future financings obtained from future fraudulent purchases-in-bulk, and these funds were used to make the repayments due on the earlier fake sales.

23. Apart from these fake bulk sales to Toshiba, Toshiba actually placed various small, individual orders with Transcosmos for very small quantities of PTC software. When these real orders were placed, PTC did not need to supply new software and license codes for these purchases. Instead, it used some of the software and codes already provided by PTC through the fraudulent bulk sales described above. Moreover. instead of paying PTC for the software involved, Transcosmos paid the funds it received from these individual Toshiba purchases to Japan Novel Corporation, a Japanese software development company, and Japan Novel in turn used these proceeds to make payments to the leasing companies that had financed the fake bulk purchases of software.

24 After April 2002, there was a decline in the number of legitimate orders for PTC software from Toshiba and, as a result, insufficient funds were generated from Toshiba to make the payments to the leasing companies on the earlier bulk software purchases. The scheme participants started to circulate a portion of the funds procured from the leasing companies through Transcosmos to Japan Novel so that Japan Novel had sufficient funds to make payments to the leasing companies. Moreover, in or around the early summer of 2003, SMBC started raising questions regarding the financing agreements and demanded that if full payment was not made to SMBC on its earlier

10

financing agreements, SMBC Leasing would contact Toshiba directly and make full disclosure.

25.   Takahashi, PTC and Transcosmos determined that SMBC Leasing should be paid in full, thereby avoiding detection by Toshiba concerning the purchases. They obtained the necessary funds by conducting a fictitious transaction. Takahashi approached GELC and falsely represented that Toshiba was purchasing 320,000,000 yen of Japan Novel software and that Toshiba needed GELC to provide the financing. By way of persuading GELC that Toshiba wanted to and was making this purchase, Takahashi fraudulently used the signature stamp of Mr. Makado Degawa, an officer of Toshiba who had real authority to bind Toshiba to such purchases. Using this unauthorized signature Takahashi induced GELC to finance a purchase (in an amount of 320,000,000 yen) of Japan Novel software from Silicon Studio Corporation. Takahashi then fabricated the delivery of the software to Toshiba by obtaining 100 CDs of software from Japan Novel, which he displayed to the GELC representative at Toshiba's headquarters. GELC obtained a written confirmation of delivery of this software from Takahashi, and actually photographed the Japan Novel software purported to be sold under this agreement, and then advanced the money for the bulk software purchase, doing so in reliance on the unauthorized use of Mr. Degawa's stamp and the false and fraudulent verification of delivery of the software. After receiving the money, Takahashi returned the software to Japan Novel and the 320,000,000 yen was used to pay off the SMBC Leasing Company for its financing of the earlier PTC software purchases.

26.   In or around the spring of 2004, there remained a substantial inventory of PTC software that had been part of the past bulk sales. Takahashi asked PTC to allow the

11

sale of this surplus PTC software to companies outside the Toshiba group so that he could generate cash for the upcoming installment payments due on the 320,000,000 yen purchase described in Paragraph 25 and payments to other leasing companies. PTC considered and then rejected this proposal. Takahashi told PTC that because they needed to generate cash to continue to be able to repay the installments on the earlier purchases as those installments became due, they needed to devise a plan to increase sales within Toshiba. PTC proposed and agreed to proactively sell PTC software to Toshiba group companies, to provide various tools at a low price to promote sales, to increase PTC employees assigned to Toshiba, and to make full efforts to engage in sales activities with Toshiba group companies in order to sell the excess inventory. Thus, PTC was aware that Toshiba had not actually received, installed or used the large and growing inventory of software purchased from PTC in previous bulk sales.

27.     However, sales to Toshiba did not in fact increase, and as a result the cash needed to pay off the earlier purchases was not forthcoming. Therefore, in or around June 2004, PTC proposed a fraudulent sale of PTC products to Toshiba in the amount of 580,000,000 yen, over and above the inventory that still remained from past bulk purchases. To accomplish this, the scheme participants proposed and executed another set of sales agreements for PTC software worth 850,000,000 yen in total, by adding to the PTC software worth 580,000,000 yen the amount necessary to pay GELC for the previous purchase of Japan Novel software and other leasing companies for past bulk purchases.

28.     Unbeknownst to GELC, while Toshiba required software for its manufacturing activities, it did not need the quantity represented by this new deal

proposed by PTC. However, because of Toshiba's size and worldwide activities, PTC, Takahashi and the other fraud participants were able to persuade GELC that Toshiba needed large quantities of this software and, over the next three years, GELC continued to accept and thus to finance as genuine the fraudulent sales represented by PTC, Takahashi and other fraud scheme participants as legitimate. Altogether, between August 2003 and March 2006, GECL advanced in excess of $62,000,000 as financing for these PTC software purchases through Transcosmos acting as a dealer for PTC.

29.     On several occasions, PTC prepared and executed fraudulent sales near the end of its fiscal quarter, thereby allowing PTC to increase the revenue it reported on its publicly filed financial statements. The total sales financed by GELC resulted in revenue to PTC and other fraud participants in excess of $47,000,000.00. PTC revenues in Japan during this period were $417.7 million. Therefore the funds received by PTC and the other fraud participants from these fraudulent Toshiba sales represented over 10% of PTC's Japanese revenue during that period. Only a small portion of the software purchased in the bulk sales was ever delivered to Toshiba, and these were actually provided in response to the legitimate separate, individual orders placed by Toshiba group companies. The vast majority of the software and license in the bulk orders was never delivered, but instead was, and remains, retained by PTC.

30.     This financing relating to the PTC software referred to above was procured from GELC by, among other means, a series of more than ten fraudulent agreements (set forth as part of Schedule "A" hereto) each of which, while varying in some of the specifics, operated in substance as follows:

13

a.      Takahashi arranged with PTC and others for PTC to provide large quantities of PTC CAD software to various software dealers for supposed resale to Toshiba.

b.      Once the software involved had been identified, Takahashi, purportedly on behalf of Toshiba, entered into an installment sales agreement with GELC using the forged signature stamp of Mr. Degawa of Toshiba, even though neither Toshiba nor Degawa had authorized, or were aware of, the bulk purchases involved, nor of the use of the forged stamp to supposedly legitimatize the orders. Takahashi falsely represented that Toshiba would pay back to GELC the purchase price of the software involved in installments once it had actually received the software from the dealer involved.

c.      GELC then entered into a purchase agreement with the software dealer involved by which GELC agreed to purchase from that dealer the PTC software that was ultimately to be sold to Toshiba under the installment sales agreement referred to in part b of this paragraph 29.

d.      The software dealer then forwarded a software order to PTC to deliver to Toshiba the PTC software to be purchased under the agreement.

e.      PTC, through its wholly-owned and controlled subsidiary in Japan, would arrange a sham delivery of the purchased CAD software directly to Toshiba, and would arrange with Takahashi to have a photograph taken of the purported delivery of said software as well as to create a fraudulent written certification that the software had been delivered, all of which was to induce GELC that the software purchase had been made.

14

f.     Upon receiving the above-described, fraudulent verification that the PTC software had been delivered to Toshiba as promised, GELC advanced the purchase price for the software through the software dealer involved, which in turn transferred a substantial portion of those funds to PTC.PTC transmitted each bulk purchase order to its Needham, Massachusetts headquarters, which recorded (but did not provide to Toshiba) the software and license codes covered by the payments. These communications were sent through interstate and foreign Internet, wire, radio and television communication in furtherance of the scheme to defraud, and therefore were a violation of the wire fraud statute (18 U.S.C. §1343). There were many of these communications by PTC between Japan and Massachusetts, and each was a separate wire fraud offense and thus a separate predicate act under the RICO Act, 18 U.S.C.§ 1962, et seq.

g.     Separately, Toshiba group companies made and paid for individual purchases of PTC software through Transcosmos, a software dealer. The dealer then forwarded the individual software orders to PTC, which transmitted these orders to its Needham, Massachusetts headquarters. PTC then provided the Toshiba group company with software and licensing codes already purchased in the bulk sales. The funds paid by the group company were diverted to make the installment payments to GELC on the bulk sales.

31.     Between August 2003 and March 2006, at least eleven (11) separate installment sales agreements, all operating in the general manner referred to in paragraph 29 of this complaint, were made between GELC and Toshiba, and at least ten (10) batches of PTC's CAD software programs were purportedly delivered to Toshiba under

15

ten (10) of those installment sales contracts. Each of these agreements was fraudulent because Toshiba had ordered none of the software involved and the bulk software deliveries were staged.

32.     Altogether, between August 2003 and April 2006, GELC transferred funds to PTC and other fraud participants in excess of $47,000,000.00 through various dealers supposedly used by Toshiba for the supposed purchases of the CAD software and licensing codes or keys referred to above. A summary of the dates, terms and conditions of each of the eleven agreements is annexed as Schedule "A" to this Complaint.

33.     PTC benefited from these fraudulent purchases of its equipment because it was paid for each and never delivered the vast majority of the software and license codes purchased. PTC knew that Toshiba did not want or need all of the software purchased under these installment agreements and that Toshiba never received all of the software. This was known to PTC because, among other reasons:

        a.      PTC knew and concealed that Takahashi was not authorized by Toshiba to enter into the sales agreements for its software.

        b.      PTC knew and concealed that a portion of the funds provided by GELC for the purchase of its software was diverted to pay GELC and other leasing company's amounts due on earlier sales agreements.

        c.      PTC arranged sham deliveries of its software to Toshiba (which were fraudulently receipted and photographed in the manner described in paragraph 29(e).

        d.      PTC knew that Toshiba was neither installing nor using the vast majority of the software covered by the installment sales contracts involved

16

because Toshiba had not sought to obtain or use all of the license codes to access, install, or use the vast majority of the software purported to have been purchased under these agreements. Given the high cost of this software, the purchaser would immediately seek after paying for it so that it could promptly install and use the PTC software.

    e.      Takahashi told PTC that Toshiba group companies were not buying the software and asked PTC to allow him to sell the already purchased software to other companies.

    f.      PTC continued to accept payments for the fraudulent purchase of more PTC software and license codes to Toshiba despite the mounting inventory of its unused software and codes already sold to Toshiba.

    g.      PTC also arranged for the delivery and download of software and license codes already purchased in the bulk orders to satisfy separate individual orders received from Toshiba group companies, which served to conceal the fraud from Toshiba.

    34.     From the date (August 2003) on which these installment sales agreements commenced, the fraudulent sales went undetected by GELC because it received payments as due under the initial installment sales purchases. These payments were made to GELC from the very funds GELC and other leasing companies had advanced for the fake PTC software purchases. In total and before GELC discovered the fraud, PTC, Takahashi, and others had caused the repayment to GELC of approximately $21,000,000.00 of the over $62,000,000.00 advanced by GELC for the PTC software.

35. Thereafter, by two letters received by GELC in October 2006, Toshiba reported that the installment sales agreements between GELC and Toshiba were not authorized by Toshiba, and that Toshiba had not received any of the software involved. Toshiba further informed GELC that the stamp purportedly used by Toshiba on these agreements was a forged stamp of Mr. Makoto Degawa, who had never authorized its use in connection with these agreements.

36. Thus for more than three years PTC participated in a scheme to defraud GELC by faking numerous large sales and deliveries of its CAD software to Toshiba while knowing and concealing from GELC that Toshiba had not authorized any of these large purchases. PTC also knew and concealed that Toshiba had not accepted, kept, installed or used the purchased software under the fraudulent agreements and that a portion of the funds provided by GELC to pay for software was diverted to repay GELC and other leasing companies monies due on earlier fake sales agreements. PTC also used some of the software and license codes purchased under the bulk transactions to fill the individual orders from Toshiba group companies, thereby concealing and furthering the fraud. Despite these facts, PTC encouraged and arranged with Takahashi to increase the amount of software purchased with each order and continued to accept and even demand payment for each subsequent purchase.

37. While this fraud commenced in August 2003, GELC did not discover it until October 11, 2006, the date it received notice from Toshiba, as described in paragraph 35.

18

## COUNT I
### (RICO Claim – 18 U.S.C. § 1962)

38.    GELC repeats and re-alleges each of the allegations contained in paragraphs 1 through 37 of this Complaint as if they were re-pleaded herein in their entirety.

39.    Defendant PTC is a "person" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3). Defendant was also associated with the enterprise described below in paragraphs 40 through 55 of this complaint. and engaged in interstate and foreign commerce to conduct or participate in the conduct of such enterprises' affairs through a pattern of racketeering, namely, and as stated in more detail below, the use of the wires in interstate and foreign commerce in order to further the fraud of faking sales to Toshiba and thereby inducing GELC and others to advance monies on said fake sales, all in violation of the wire fraud statute (18 U.S.C.§ 1343), a racketeering activity as defined by 18 U.S.C. §1961(1). Since defendant engaged in many wirings, each a separate racketeering activity, defendant has engaged in a pattern of racketeering within the meaning of 18 U.S.C. §1961(5)

40.    Commencing on or before August 2003, and continuing up to and including at least October 11, 2006, defendant PTC violated 18 U.S.C. § 1962(c).

### The Enterprise

41.    Defendant PTC, Transcosmos, Takahashi, and other scheme participants associated in fact with each other so as to constitute an "enterprise" within the meaning

of 18 U.S.C. §§ 1961(4) and 1962(c). At all times relevant to this Complaint, this enterprise was engaged in, and its activities affected, interstate and foreign commerce.

42. The association in fact enterprise included, but was not limited to, scheme participants defendant PTC, Transcosmos and Takahashi.

43. Defendant PTC, Transcosmos, Takahashi and other scheme participants associated with each other for the common purpose of defrauding GECL and its employees and converting its funds and property for their personal gain.

44. This association in fact enterprise existed apart from its predicate acts. Defendant PTC, Transcosmos, Takahashi and other scheme participants associated with the enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment in promotion of the enterprise's activities.

## Direction of the Enterprise's Affairs

45. Defendant PTC, Transcosmos, Takahashi and other scheme participants knowingly and fraudulently conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise within the meaning of 18 U.S.C. § 1962(c). Furthermore, defendant PTC, Transcosmos, Takahashi and other scheme participants were "employed by or associated with" the enterprise within the meaning of 18 U.S.C. § 1962(c).

46. Defendant PTC, Transcosmos, Takahashi and other scheme participants participated in the conduct of the affairs of the enterprise through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

20

## The Pattern of Racketeering Activity

47.     The predicate acts of racketeering are acts which are enumerated in 18
U.S.C. § 1961(1)(A) or acts which are indictable under provisions of the U.S. Criminal
Code enumerated in 18 U.S.C. §1961(1)(B), as more specifically alleged below. At least
two acts by defendant PTC that constituted violations of such criminal provisions also
constituted instances of "racketeering activity" within the meaning of the above statutory
sections.

48.     As set out in the preceding paragraphs and under the later paragraphs of
this Complaint, defendant PTC engaged in numerous predicate acts over a substantial
period of time. The unitary scheme began on or before August 2003 and continued
through at least October 11, 2006.

49.     The predicate acts demonstrated a variety of unlawful activities, each
conducted in furtherance of the enterprise and the common purpose to defraud GECL and
its employees. The predicate acts also had the same or similar results, participants,
victims, and methods of commission. The predicate acts are related and are not isolated
events. They all occurred within a three year period.

## Wire Fraud

50.     Defendant PTC engaged in acts, examples of which are more fully set out
above in this Complaint, that constituted wire fraud within the meaning of 18 U.S.C. §§
1343 and 1346. Defendant PTC devised one or more schemes or artifices to defraud or to
obtain money or property by means of false or fraudulent pretenses, representations or
promises, or to deprive another of intangible services. For the purposes of executing or

21

attempting to execute its schemes or artifices, defendant PTC used Internet wire transmissions and interstate telephone calls in furtherance of its schemes or artifices and to communicate and send software, license codes and other information between its offices in Massachusetts and Japan and to communicate with co-conspirators, all in furtherance of its schemes and artifices. In addition, defendant PTC authorized and/or caused funds to be sent by wire transfer from GECL to scheme participants and ultimately to PTC for purposes of funding the fraudulent bulk sales. Defendant PTC knowingly and willingly participated in the schemes knowing that each was fraudulent.

51.     Defendant PTC engaged in a scheme to defraud that included, but is not limited to, the acts and conduct set forth in Paragraphs 19 through 35 of this Complaint, among other actions.

52.     Defendant PTC's scheme outlined above was reasonably calculated to deceive persons of ordinary prudence and comprehension.

53.     For the purpose of executing its scheme, defendant PTC and other enterprise members transmitted by means of Internet, wire, radio, or television communication in interstate or foreign commerce, various documents and communications specified below in violation of 18 U.S.C. §§ 1343 and 1346. In furtherance of this scheme, defendant PTC caused the following communications to be transmitted by means of wire or radio in interstate or foreign commerce:

a.     Upon receiving the fraudulent verification that the PTC software had been delivered to Toshiba as promised, GELC advanced the purchase price for the software, through the software dealer involved, to PTC. PTC transmitted each

22

bulk purchase order to its Needham, Massachusetts headquarters, which recorded and managed the software and license codes covered by the payments. The dates of these wire communications correspond approximately to the dates of the fraudulent verifications and GELC payments listed in Appendix A.

b.     Upon information and belief, payments made by GELC under the installment sales contracts were sent by wire from defendant PTC's accounts in Japan to its accounts in the United States.

c.     To conceal the fraud from Toshiba and GECL, PTC arranged for the delivery and download of software and license codes already purchased in the bulk orders to satisfy the individual orders received from Toshiba group companies by transmitting them by means of wire communications from Massachusetts to Japan.

54.     For the purpose of executing its scheme, defendant PTC and other enterprise members executed Internet wire and radio communications described above. These were undertaken in furtherance of a scheme to defraud GELC of its property and Toshiba of the intangible right of honest services of its employee Takahashi, all in violation of 18 U.S.C. §§ 1343 and 1346.

## RICO Injury

55.     By violation of 18 U.S.C. § 1962(c), GECL has sustained substantial injury to both its business and its property, including the loss of GECL funds, costs of investigation and of efforts to recover its losses.

56.     The substantive RICO and conspiracy violations of defendant PTC from
which PTC profited were the actual cause of GELC's damages, which would not have
occurred without the PTC's conduct. In addition, the acts and violations were the direct,
natural, and proximate cause of damage to GECL, including, but not limited to, loss of
GECL funds and costs of investigations and of efforts to recover its losses.

## COUNT II

(RICO Conspiracy Claim – 18 U.S.C. § 1962(d))

57.     Plaintiff realleges each and every allegation contained in Paragraphs 1
through 56 of this Complaint as if fully set forth herein.

58.     In violation of 18 U.S.C. § 1962(d), from on or about August 2003 up to at
least October 11, 2006, defendant PTC, Transcosmos, Takahashi, and other scheme
participants conspired with each other to violate 18 U.S.C. § 1962(c).

59.     The objects of the conspiracy included, without limitation, causing GECL
to fund bulk purchases of PTC software when in fact there were no bulk deliveries of
PTC software; to have GECL continue to fund additional bulk purchases by paying funds
from the original bulk purchases as payments on the subsequent bulk purchases; retaining
and/or converting funds that rightfully belonged to GECL; and increasing PTC sales
revenues through these false bulk sales. By this and other conduct, defendant PTC,
Transcosmos, Takahashi, and other scheme participants gained personal benefits;
obtained funds directly from the conversion of GECL funds for their own use; and
fraudulently profited through both the conversion of GECL funds and the use of GELC's
money.

24

60. Defendant PTC and each co-conspirator agreed and combined with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Defendant PTC, by its words or actions, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the enterprise.

61. The agreement of defendant PTC, Transcosmos, Takahashi, and other scheme participants to engage in a pattern of racketeering activity can be reasonably inferred from: their mutual financial gain resulting from their pattern of racketeering activity and the dependency of the fraudulent acts and representations of each on the fraudulent acts and representations of the others. The agreement was manifested, among other ways, by the number and similarity of the racketeering offenses committed by defendant PTC, Transcosmos, Takahashi, and other scheme participants.

62. At least one overt and wrongful act (or omission despite a duty to GECL) was done (or was failed to be done, despite a duty to GECL) by one or more of the conspirators to achieve the purpose of the conspiracy. Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

63. As described above, the conspiratorial agreement was an agreement to participate in an enterprise that engaged in racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1962(c), in addition to an agreement to commit the multiple offenses underlying the racketeering activity.

64.    As described above, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). Each co-conspirator knew that the acts in furtherance of the conspiracy were part of a pattern of racketeering activity.

65.    As a result of one or more acts predicate to the conspiracy and the defendant's conduct or participation in the conduct of the enterprise's affairs through a pattern of racketeering activity, GECL has sustained substantial injury to both its business and its property, including the loss of GECL funds.

66.    The acts and violations of defendant PTC and its co-conspirators were the actual cause of GELC's damages, which would not have occurred without the defendant's conduct. In addition, the acts and violations were the direct, natural, and proximate cause of damage to GECL.

## COUNT III
### (Common Law Fraud)

67.    GELC repeats and re-alleges each of the allegations contained in paragraphs 1 through 66 of this Complaint as if they were re-pleaded herein in their entirety.

68.    For more than three years, from August 2003 to October 2006, PTC participated in a scheme to defraud GELC by faking numerous, large sales of its CAD software to Toshiba knowing and concealing from GELC that Toshiba had not authorized any of these large purchases. PTC also knew and concealed that Toshiba had not accepted, kept or used the vast majority of the purchased software requested under the agreements and that a portion of the funds provided by GELC supposedly to pay for

software was diverted to repay GELC and other leasing companies monies due on earlier fake sales agreements. Despite these facts, PTC encouraged Takahashi to increase the amount of software purchased with each order and continued to accept and even demand payment for each subsequent purchase.

69.     Accordingly, PTC and the other scheme participants engaged in common law fraud because they knew the statements they had made and actions they were undertaking were false, they made the false statements and took the deceitful actions with intent to deceive GELC, both the statements and the actions were material to GELC's decision to enter into the sales contracts referred to in this complaint, GELC's reliance was reasonable and it was injured by the statements and actions because it induced them to advance in excess of $67,000,000 of which they have lost at least $47,000,000.

70.     PTC and the other fraud participants also engaged in fraud in the execution of these contracts because PTC knew and participated in the delivery of the software, the sham photographs of those purported software sales, and the fraudulent certification that the software had in fact been delivered to Toshiba when it had not in fact been delivered.

71.     Because GELC financed the purchase of this uninstalled and unused software with monies that ultimately went to PTC, PTC and other fraud participants also benefited by more than $47,000,000.00 from the monies it received in furtherance of this fraud. PTC is therefore liable for this amount.

72.     Although this fraud commenced in August 2003, GELC did not discover it until October 11, 2006, the date (see paragraph 35 hereof) it received notice from Toshiba

reporting that it knew nothing about the agreements, had not authorized them and had not received or used any CAD-CAM software purchased with the agreements.

73.     Based upon the allegations stated above, beginning in or around August 2003 and continuing up to and including at least October 11, 2007, PTC, and the other scheme participants and others as yet unknown to GELC did, in this District and elsewhere, defraud GELC by obtaining in excess of $47,000,000.00 by false and misleading pretenses and representations, by concealing materials facts, and by repeatedly using the wire, radio and satellite communications in interstate and foreign commerce to and from this District to make and further said representations, conceal materials facts, and to induce reliance by GELC on the representations and thus to consummate the fraud.

74.     GELC relied upon the false and misleading representations outlined above and this reliance caused GELC to fund each of the installment sales agreements. PTC has therefore damaged GELC in the manner and to the extent to be proved at trial which will be at least U.S.47,000,000.00, trebled with attorneys fees.

## COUNT III
(Fraud Against GELC)

75.     GELC repeats and re-alleges each of the allegations contained in paragraphs 1 through 74 of this Complaint as if they were re-pleaded herein in their entirety.

76.     Based upon the allegations stated above, beginning in or around August 2003 and continuing up to and including at least October 11, 2006, PTC, and the other scheme participants and others as yet unknown to GELC did, in this District and elsewhere, defrauded GELC by obtaining in excess of $47,000,000.00 by false and

28

misleading pretenses and representations, by concealing materials facts, and by

repeatedly using the Internet wire, radio and satellite communications in interstate and

foreign commerce to and from this District to make and further said representations,

conceal material facts, and to induce reliance by GELC on the representations and thus to

consummate the fraud.

77.     GELC relied upon the false and fraudulent statements outlined above and

this reliance was reasonable, and caused GELC to fund each of the installment sales

agreements.  PTC has therefore damaged GELC in the manner and to the extent to be

proved at trial.

## COUNT IV

### (Negligent Misrepresentation)

78.     GELC repeats and re-alleges each of the allegations contained in

paragraphs 1 through 77 of this Complaint as if they were re-pleaded herein in their

entirety.

79.     Although GELC alleges that at all relevant times PTC knew that the sales

were a sham, that the vast majority of the software and license codes purchased were

never delivered to Toshiba, that funds provided by GELC for the purchases were diverted

to lull GELC by paying GELC and other leasing companies monies due on earlier sales

agreements for PTC software, and that PTC was therefore a knowing participant in this

fraudulent scheme, it is alternatively alleged herein that, even if PTC did not in fact know

of the sham nature of the sales, it should have known that the sales were shams and thus

its statements made herein were negligent representations made without a reasonable

basis for believing that they were true when made.

80.     These negligent representations proximately caused GELC to lose more than $47,000,000.00 because it relied upon said representations as being true and advanced the monies involved because it formed that belief, and these representations caused GELC to believe that it would indeed be repaid the monies it had advanced and therefore to advance the funds for each of the sales agreements.

80.     GELC has been damaged as a result of this negligence in the amount to be proved at trial.

WHEREFORE, GELC prays judgment as follows

[I]     For damages on each count in the amounts proved at trial, which will be at least US $47,000,000.00 with damages proved on Counts I and II trebled, with attorneys fees;

[II]     Entry of judgment awarding costs and expenses;

[III]     The award of all allowable pre-judgment and post-judgment interest on all recovered sums; and

[IV]     For such other and further relief is deemed just by this Court.

Respectfully submitted,

John J. E. Markham, II, Esq.
(BBO # 638579)
MARKHAM & READ
One Commercial Wharf West
Boston, Mass. 02110
Tel. 617-523-6329
Fax. 617-742-8604

SCHEDULE "A" GELC COMPLAINT

[Summary of the Instalment Sales Contracts Referred to in Complaint ¶ 24]

1.  Japan Novel Software Agreement

    a)  GELC entered into with Toshiba on August 27, 2003, an instalment sales agreement under which GELC was to sell to Toshiba certain Japan Novel software at a price of approximately 333,000,000.00 yen.

    (b)  GELC sent to Silicon Studio a purchase order for the above-mentioned software.

    (c)  CD-ROMs containing the above-mentioned software were delivered to Toshiba and GELC received from Toshiba the acknowledgement of receipt.

    (d)  On September 29, 2003, GELC paid the full amount of the sales price and was led to believe that Toshiba was to repay this amount in instalments.

    (e)  The software involved was purported to be delivered to Toshiba.

**2.  PTC Software Agreement 1**

    (a)  GELC entered into with Toshiba on June 17, 2004 an instalment sales agreement under which GELC was to sell to Toshiba certain PTC CAD-software at a price of approximately US $7,619,400.00, and Toshiba would pay to GELC such sales price in instalments through Japan Novel, a Japanese company acting as an intermediary for Toshiba. .

    (b)  GELC sent to Silicon Studio a purchase order for the above-mentioned software.

    (c)  CD-ROMs containing the above-mentioned software were purported to have been delivered to Toshiba and GELC received from Toshiba the acknowledgement of receipt.

    (d)  On June 25, 2004, GELC paid the full amount of the sales price and Toshiba was to repay this amount in instalments.

**3.  PTC Software Agreement 2**

    (a)  GELC entered into with Toshiba an instalment sales agreement on September 27, 2004, under which GELC was to sell to Toshiba certain PTC software at a price of approximately US $7,150,200, and Toshiba would pay to GELC such sales price in instalments through Japan Novel, a Japanese company acting as an intermediary for Toshiba.

 (b) GELC placed an order for the above-mentioned software to software dealers one of which was acting on behalf of PTC.

 (c) The CD-ROMs containing the above-mentioned software were purported to have been delivered to Toshiba and GELC received from Toshiba the acknowledgement of receipt.

 (d) On October 15, 2004, GELC paid the full amount of the sales price for this software and Toshiba was to repay this amount in instalments.

## 4. PTC Software Agreements 3 and 4

 (a) GELC entered into with Toshiba on December 22, 2004, and March 18, 2005, respectively, two instalment sales agreements under which GELC would sell to Toshiba certain PTC software at a price of approximately US $4,023,900.00 and US $7,510,464, respectively, and Toshiba would pay such sales price through an intermediary in instalments.

 (b) GELC thereafter sent purchase orders for the above-mentioned software to Transcosmos acting on behalf of PTC.

 (c) CD-ROMs containing the above-mentioned software were purported to have been delivered to Toshiba and GELC received from Toshiba the acknowledgement of receipt.

 (d) On January 20 and April 20, 2005, GELC paid the full amount of the sales price and Toshiba was to repay this amount in instalments.

## 5. PTC Software Agreements 5 and 6

 (a) GELC entered into with Toshiba on March 18, 2005 and June 20, 2005, respectively, two instalment sales agreements under which GELC would sell to Toshiba certain PTC software at a price of approximately US $4,120,596.00 and US $670,750.00, respectively, and Toshiba would repay such sales price in instalments through an intermediary.

 (b) GELC sent to Silicon Studio purchase orders for the above-mentioned software.

 (c) CD-ROMs containing the above-mentioned software were purported to have been delivered to Toshiba and GELC received from Toshiba the acknowledgement of receipt.

 (d) On April 20 and June 30, 2005, GELC paid the full amount of the sales price and Toshiba was to repay this amount in instalments.

**6.    PTC Software Agreements 7 through 10**

   (a)  GELC entered into with Toshiba on September 27, 2005, January 27, 2006 and March 27, 2006, respectively, four instalment sales agreements under which GELC would sell to Toshiba certain PTC software at a price of approximately US \$13,923,000.00, US \$3,918,005.00, US \$1,716,069.00 and US \$18,565,000.00, and Toshiba would repay GELC in instalments through an intermediary.

   (b)  GELC sent to Silicon Studio purchase orders for the above-mentioned software.

   (c)  CD-ROMs containing the above-mentioned software were purported to have been delivered to Toshiba and GELC received from Toshiba the acknowledgement of receipt.

   (d)  On October 20, 2005, February 28, 2006, and April 25, 2006, respectively, GELC paid the purchase price for the technology involved and Toshiba was to repay GELC in installments.