```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


_____
                               )
GE CAPITAL LEASING             )
CORPORATION,                   )
     Plaintiff,                )
                               )
          v.                   )    CIVIL ACTION
                               )    NO. 07-11416-DPW
PARAMETRIC TECHNOLOGY          )
CORPORATION,                   )
     Defendant.                )
_____)
```

MEMORANDUM AND ORDER
September 30, 2010

Plaintiff GE Capital Leasing Corporation ("GELC"), a financial services company, brought this complaint against defendant Parametric Technology Corporation ("PTC-US"),[1] an international software manufacturer and distributor, alleging that it suffered injuries as a result of PTC's fraudulent actions. GELC claimed that PTC convinced GELC to provide over $60 million in financing for purported sales of its software to Toshiba, a Japanese corporation. In reality, according to GELC, Toshiba never agreed to buy the vast majority of the software PTC represented was being sold and as a result GELC suffered millions

---

[1] In the complaint, GELC often does not distinguish between PTC-US and PTC-Japan and refers simply to "PTC." I also note that the parties report in their status report of earlier this month that the plaintiff is now known as GE Japan Corporation. In this Memorandum and Order, I will generally refer to the parties as they are identified in the complaint.

1

of dollars in losses.  GELC sought to assert four claims against PTC alleging it violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), committed common law fraud, and made negligent misrepresentations which harmed GELC.  PTC moved to dismiss on grounds, inter alia, of *forum non conveniens*.  After I indicated, during a motion hearing, my inclination to develop a stipulation to ensure that the jurisdiction of Japanese courts over PTC-US was uncontested, that any Japanese judgment would be enforceable against PTC-US in the United States Courts and that certain discovery from PTC-US would be facilitated, GELC objected that the stipulation was inadequate and sought leave to file a second amended complaint.[2]  After reviewing the several submissions of the parties contesting the adequacy of the

---

[2]  GELC also sought to file a second amended complaint. There were two major additions in the proposed pleading: 1) a constructive trust claim and 2) assertion of additional facts relating to PTC-US' involvement in the fraudulent scheme.  GELC contended that it should be allowed to amend its complaint pursuant to FED. R. CIV. P. 15(a)(2) because the changes and additions did not prejudice PTC-US and the substance of the case would not be affected by the new allegations.  PTC-US argued that the motion for leave to file an amended complaint should be denied because the proposed amendments are futile.  PTC-US contended that the changes that GELC attempts to make would not change the *forum non conveniens* analysis or otherwise stave off dismissal.
  This motion was effectively denied because it did not change the *forum non conveniens* analysis which supported my allowance of the motion to dismiss.  Even under the proposed amended complaint, Japan remains an adequate alternative forum and the proposed amendment would not alter that conclusion. Consequently, amendment would be futile in that it would be immaterial. *See Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 191 (1st Cir. 2006).

stipulation, I allowed on September 30, 2008 the motion to dismiss upon the final stipulation submitted by PTC-US, which I informed the parties "will be treated as an obligatory undertaking of the defendant subject to continued jurisdiction of the court." Promising a full Memorandum of decision to follow, I did not direct the Clerk to enter a final judgment. Thereafter, GELC moved to vacate the order granting the dismissal. I took no further action while matters progressed in the Japanese Courts.

In response to my request for a status report last month and at a status conference earlier this month, GELC reported that its counsel in the Japanese litigation chose not to make PTC-US a party to those proceedings, apparently because of the perception that Japanese Courts would not afford meaningful discovery. The Japanese litigation, now encompassing three separate actions, is not yet concluded. Opinions in some of the actions are expected later this fall. GELC seeks to have me defer further a final disposition of this case pending the outcome in the Japanese litigation. I decline to do so and this Memorandum is designed to provide a full explanation of my reasons for now directing the Clerk to enter a judgment of dismissal on *forum non convenience* grounds.

## I. STATEMENT OF FACTS

Because a motion to dismiss is at issue, I have treated all well pleaded facts in the complaint as true. *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007).

*A.   The Parties*

The plaintiff, GELC, is a financial services company based in Tokyo, Japan. (Compl. ¶ 1.)  GELC uses its funds to finance the purchase of software and other equipment for its customers in exchange for the customers' agreement to repay the loan with interest.  (*Id.* ¶ 7.)

The defendant, PTC-US is a software manufacturer and distributor based in Needham, Massachusetts.  (*Id.* ¶ 1.)  PTC-US develops, markets, and sells high-tech software products.  (*Id.* ¶ 8.)  Parametric Technology Corporation Japan, Inc. ("PTC-Japan") is a wholly-owned subsidiary and agent of PTC-US.  (*Id.* ¶ 1.)

Toshiba is an international company engaged in the design and manufacture of different types of products, including computer technologies.  (*Id.* ¶ 16.)  During the relevant time period, Kazuo Takahasi was a managerial-level employee of Toshiba.  (*Id.* ¶ 17.)

*B.   PTC's CAD and CAM Technology*

PTC manufactures and distributes computer software products, including computer-aided design ("CAD") and computer-aided manufacturing ("CAM") software.  (*Id.* ¶ 10.)  To use the CAD-CAM software, a purchaser must have a CD-ROM disk with the software on it or have access to a computer server on which the software is stored.  (*Id.* ¶ 12.)  The purchaser must also obtain a license code to make the software operable.  (*Id.*)  PTC maintains and

administers the license codes on computer servers located in and controlled from Needham, Massachusetts. (*Id*. ¶ 13.) Without the requirement of a separate license code for each copy of CAD-CAM software, one copy of the software could be used on as many computers as a purchaser desires. (*Id*. ¶ 14.) Thus, the license codes assure that a purchaser seeking to install the software on more than one computer will purchase multiple copies of the software. (*Id*.) Toshiba uses this CAD-CAM software in many of its design processes. (*Id*. ¶ 11.)

    C.   *The Fraudulent Scheme*

In 2000, Takahashi determined that the appropriate software for streamlining Toshiba's design software was the CAD software manufactured by PTC. (*Id*. ¶ 19.) PTC proposed a plan to Takahashi whereby Toshiba would buy its CAD software in bulk for a discounted price. (*Id*.) Takahashi brought PTC's proposal to Toshiba but was not able to secure approval from his superiors. (*Id*.) Instead of making a bulk purchase, Toshiba decided to purchase the CAD software in small amounts on an as-needed basis. (*Id*.)

Following Toshiba's rejection of the proposed deal, Takahashi and PTC approached Sumitomo Metal System Solutions Co., Ltd. ("Sumitomo"), a software dealer. (*Id*. ¶ 20.) Following negotiations, Sumitomo agreed to conduct a purchase-in-bulk transaction to procure a large quantity of PTC software. (*Id*.)

Sumitomo would hold the PTC software as inventory with the intent of making smaller individuals sales to Toshiba. (*Id.*) When Toshiba placed an individual purchase order for PTC software with Sumitomo, PTC would provide the software license codes for each purchase directly to Toshiba. (*Id.*) PTC arranged for a leasing company, SMBC Leasing Company ("SMBC"), to finance the purchase-in-bulk transaction by Sumitomo. (*Id.*) Sumitomo used the sales proceeds it received from Toshiba on individual software orders to make installment payments to SMBC as they became due. (*Id.*) Toshiba did not know about the bulk purchases by Sumitomo and/or the financing agreement between Sumitomo and SMBC. (*Id.*)

In 2002, the individuals employed by Sumitomo who ran the purchase-in-bulk program left Sumitomo and joined Transcosmos, Inc. ("Transcosmos"). (*Id.* ¶ 21.) PTC, Takahashi, and Transcosmos agreed that Transcosmos would replace Sumitomo as the party purchasing software in bulk directly from PTC. (*Id.*) Transcosmos would then sell the PTC software to Toshiba when Toshiba made smaller orders. (*Id.*) The parties also agreed that the purchases of PTC software would be financed by funds advanced by leasing companies. (*Id.*)

Transcosmos informed the leasing companies that the money loaned to them was being used to purchase CAD software in bulk for Toshiba. (*Id.*) The leasing companies were also informed that Toshiba would make the installment payments on the loans as

6

they became due.  (*Id.*)  Takahashi took actions to induce the leasing companies to believe that Toshiba was in fact making the purchases.  (*Id.*)  For example, Takahashi fraudulently used his title as "IS Center Group Leader: Kazuo Takahashi" or used a forged signature stamp of Makoto Degawa, the Chief of Toshiba's IS Center Engineering System Department, to convince the lending companies that he was authorized to make the bulk purchases on Toshiba's behalf.  (*Id.*)

Apart from Takahashi's fraudulent transactions, Toshiba placed legitimate orders with Transcosmos for small quantities of PTC software.  (*Id.* ¶ 23.)  Transcosmos used the funds it received from Toshiba from these orders to make payments to the leasing companies that had financed the fake bulk purchases of software.  (*Id.*)  After April 2002, the number of legitimate orders Toshiba made for PTC software declined.  (*Id.* ¶ 24.)  Consequently, Transcosmos had insufficient funds to make the payments to the leasing companies on the earlier fake bulk software purchases.  (*Id.*)

In the summer of 2003, SMBC began to question the financing agreements and threatened that, if full payment was not made to it on its earlier financing agreements, SMBC would contact Toshiba directly and disclose the scheme.  (*Id.*)  At that point, Takahashi, PTC, and Transcosmos decided to pay SMBC in full.  (*Id.* ¶ 25.)  They obtained the money to pay SMBC through a series of transactions with GELC.  (*Id.*)

  D. *The Fraudulent Transactions Involving GELC*

  The financing for the PTC software was procured from GELC through a series of fraudulent agreements. (*Id*. ¶ 30.) All of the agreements had the same basic structure. (*Id*.) Takahashi arranged with PTC to provide large quantities of CAD software to various software dealers for purported resale to Toshiba. (*Id*. ¶ 30(a).) After the software was identified, Takahashi, purportedly on behalf of Toshiba, entered into an installment sales agreement with GELC. (*Id*. ¶ 30(b).) When dealing with GELC, Takahashi used the signature stamp of Degawa to show GELC that Toshiba approved the deal. (*Id*.) Takahashi also falsely represented that Toshiba would make the installment payments once it received the software. (*Id*.) Consequently, GELC entered into a purchase agreement with a software dealer. (*Id*. ¶ 30(c).)

  In the agreement, GELC agreed to purchase from the dealer the PTC software that was to be sold to Toshiba. (*Id*.) In response, the software dealer forwarded an order to PTC which indicated the software that was to be delivered to Toshiba. (*Id*. ¶ 30) PTC-Japan then arranged a sham delivery of the CAD software to Toshiba. (*Id*.) PTC-Japan also arranged for Takahashi to have a photograph taken of the purported delivery and to create a fraudulent written certification that the software had been delivered. (*Id*. ¶ 30(e).) These measures were

carried out to induce GELC to believe that the software purchase had been made by Toshiba.  (*Id.*)

After obtaining the fraudulent verification that Toshiba received the software, GELC advanced the purchase price for the software to the software dealer.  (*Id.* ¶ 30(f).)  The software dealer, in turn, transferred a substantial portion of those funds to PTC.  (*Id.*)  PTC transmitted each bulk purchase order to its Needham, Massachusetts office, which recorded the software and license codes covered by the payments.  (*Id.*)  PTC did not provide the license codes to Toshiba.  (*Id.*)  The correspondence was sent through internet, wire, radio and television communication.  (*Id.*)

Separately, Toshiba made individual purchases of PTC software through Transcosmos.  (*Id.* ¶ 30(g).)  Transcosmos forwarded the individual software orders to PTC, which transmitted these orders to its Needham, Massachusetts office.  (*Id.*)  PTC then provided Toshiba with software and licensing codes that had already been purchased in the bulk sales.  (*Id.*)  The funds paid by Toshiba were diverted to make installment payments to GELC for the bulk sales.  (*Id.*)

Between August 2003 and March 2006, at least eleven separate installment sales agreements were made between GELC and Toshiba.  (*Id.* ¶ 31.)  In total, GELC transferred funds to PTC and other participants in the scheme in excess of $47 million.  (*Id.* ¶ 32.)

GELC alleges that PTC knew that Toshiba did not want or need all of the software purchased under the installment agreements. (*Id.* ¶ 31.)

GELC did not initially understand that the installment sales agreements were fraudulent because it received payments as due under the initial installment sales purchases. (*Id.* ¶ 34.) Before GELC discovered the fraud, PTC, Takahashi, and others had caused the repayment to GELC of approximately $21 million of the $62 million advanced by GELC for the PTC software. (*Id.*)[3]

In October 2006, GELC received two letters from Toshiba reporting that the installment sales agreements between GELC and Toshiba were not authorized by Toshiba. (*Id.* ¶ 35.) Toshiba also informed GELC that it had not received any of the software and that the stamp purportedly used by Toshiba was a forged stamp of Degawa. (*Id.*)

   E.   *The Japanese Litigation*

The Japanese litigation now involves three separate actions in the Tokyo District Court. Two of these actions are recision claims against Transcosmos, the third is the consolidated fraud action against PTC-Japan, the wholly-owned Japanese subsidiary of PTC-US, and three other Japanese companies. GELC brought PTC-Japan into the fraud action about three months after I allowed

---

[3] The complaint is internally inconsistent regarding the amount of financing GELC provided. *Compare* (Compl. ¶ 32.) ($47 million) *and* (*Id.* ¶ 34.)($62 million).

the motion to dismiss this action against PTC-US on *forum non convenience* grounds.  This fraud action has proceeded to trial and an opinion is expected on November 17, 2010.  GELC has not, however, chosen to bring PTC-US into any of the Japanese litigation.  As to the matter before me, there are no ripe issues concerning performance of the stipulation by PTC-US.

## II. DISMISSAL ON GROUNDS OF FORUM NON CONVENIENCE

Under the doctrine of *forum non conveniens*, a court may decline to exercise its jurisdiction, even when the court has jurisdiction and venue, if it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum.  *See generally Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).  Courts invoke this common-law doctrine "to bring about an *international* transfer of a case (from the United States to a foreign state) where plaintiffs may bring approximately the same action in the foreign forum, but without the unfairness and inconvenience that trying the case in this country would entail."  *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 948 (1st Cir. 1991); *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722-23 (1996).

Generally, "there is a strong presumption in favor of a plaintiff's forum choice."[4]  *Nowak v. Tak How Invs., Ltd.*, 94

---

[4] A foreign plaintiff's choice of forum is entitled to "less deference" than a domestic plaintiff's.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).

F.3d 708, 719 (1st Cir. 1996). To overcome this presumption, the defendant must show that "an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum." *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000).

   A.   *Adequate Alternative Forum*

A foreign court is adequate "if the defendant demonstrates that the alternative forum addresses the types of claims that the plaintiff has brought." *Id.* The Supreme Court has made clear that an alternate forum will only be inadequate for *forum non conveniens* purposes in "rare circumstances." *Piper*, 454 U.S. at 255 n.22. For example, the fact that a foreign forum does not provide the same potential remedies that are available in an domestic court does not make it an inadequate forum. *Howe*, 946 F.2d at 951. Similarly, the fact that potential monetary damages are smaller in a foreign country than they are in the United States does not render that forum inadequate. *Iragorri*, 203 F.3d at 14. Finally, different discovery procedures in a foreign court usually do not make it inadequate for *forum non conveniens* purposes. *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1352-53 (1st Cir. 1992) ("[A]n alternative forum ordinarily is not considered 'inadequate' merely because its courts afford different or less generous discovery procedures than are available under American rules."); *see also Howe*, 946 F.2d at 952

("Controlling precedent makes clear, however, that small differences in standards and procedural differences . . . are beside the point.").

An alternative forum may be deemed inadequate for a variety of reasons. For example, a foreign court is inadequate if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all" or if the court "does not permit litigation of the subject matter of the dispute." *Piper*, 454 U.S. at 254-55. Similarly, an alternative forum is not adequate if "the plaintiff demonstrates significant legal or political obstacles to conducting the litigation in the alternative forum." *Mercier*, 981 F.2d at 1350.

During a status conference on November 27, 2007, I indicated that I would consider Japan to be a wholly adequate alternative forum upon the agreement of PTC-US to submit to the jurisdiction of Japan and not to raise any jurisdictional defenses. My understanding that PTC-US would submit to jurisdiction in Japan was based on the fact that it had indicated in its reply memorandum that "[i]f GELC/Japan's claims are dismissed on *forum non conveniens* grounds, PTC-US will submit to jurisdiction in Japan and will not raise any jurisdictional defenses in the Japanese courts." PTC-US reaffirmed this position during the status conference. I also observed that GELC had not identified

any characteristics of Japanese courts that made them inadequate.[5]

In post-hearing submissions, PTC-US stipulated that it was willing to submit to the jurisdiction of Japanese courts.[6]  I find the willingness of PTC-US to submit to personal jurisdiction in Japan is enough to satisfy the adequate alternative forum prong of the *forum non conveniens* analysis.

Central to the *forum non conveniens* doctrine is the requirement that the case is capable of being heard in two different venues.  Thus, for dismissal on *forum non conveniens* grounds to be appropriate, the foreign court must have jurisdiction to adjudicate the underlying dispute.  If the foreign court cannot hear the case because it lacks subject matter jurisdiction then it would not provide an adequate alternative forum.  *See Mercier*, 981 F.2d at 1349 (affirming

---

[5] GELC's main argument during the hearing was that Japan was an inadequate forum because the discovery procedures in Japan were less accommodating than the discovery procedures in the United States.  I find this argument unconvincing. *See Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991) (finding that a Japanese forum was not inadequate even though it had different discovery procedures than American courts).

[6] When PTC-US submitted its stipulation it agreed "that it will submit to the jurisdiction of the Tokyo District Court" and "that it will raise no jurisdictional defenses *based on the fact it is a U.S. company*." (emphasis added.)  In a subsequent letter to the court, PTC-US explained that it limited its stipulation to ensure that "the stipulation does not amount to a waiver of other defenses . . . such as lack of service of process or lack of subject matter jurisdiction."

district court's decision to dismiss on *forum non conveniens* grounds provided "acceptance of jurisdiction by the Turkish courts"); *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 743 F.2d 48, 50 (1st Cir. 1984) ("Dismissal in one forum is only proper upon a supported finding that another adequate forum exists where the plaintiff can litigate essentially the same claim"); *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir. 1993) ("A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum.") (quoting *In re Air Crash Disaster*, 821 F.2d 1147, 1165 (5th Cir. 1987)). Indeed, if I had dismissed this case on *forum non conveniens* grounds and the Tokyo District Court subsequently dismissed GELC's claims because it lacked subject matter jurisdiction to hear the case, the plaintiff would not be able to litigate the dispute in either court. Such a result would be contrary to the *forum non conveniens* doctrine. But that result is not applicable here and GELC does not suggest otherwise. The Japanese litigation is addressing the types of claims sought to be presented here. For reasons of its own, GELC has simply chosen not to pursue PTC-US in the Japanese courts.

I do not find the stipulation with respect to the enforceability of a judgment from a Japanese court in the United States to be problematic. At the hearing before me, GELC had expressed concern that a judgment arising from the litigation in

Japan would not be enforceable in the United States.  GELC conceded that it had not identified a case where a Japanese judgment was not enforced in the United States.  Nevertheless, it sought an assurance from PTC-US that it would not contest the enforceability of a Japanese judgment in the United States.  In response to GELC's request, PTC-US stipulated that "it will pay a final judgment obtained by GELC/Japan against it in litigation in Japan that arises out of a cause of action based on the transactions described in the amended complaint" and "that any such final Japanese judgment will be enforceable in the U.S. except for fraud and the other usual exceptions (except a lack of jurisdiction defense waived by these stipulations) to full faith and credit."

Japan is an adequate forum for resolution of any dispute involving PTC-US related to the Japanese litigation.

B.    *Private And Public Interest Factors*

The second requirement is that "the defendant must show that the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal." *Iragorri*, 203 F.3d at 12.  More specifically, the defendant must prove "the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum." *Mercier*, 981 F.2d at 1349.

A court balances various public and private considerations when determining which forum is the most convenient.  The private interests generally are the "practical problems that make the trial of a case easy, expeditious and inexpensive." *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947).  These considerations include "the comparative convenience of the parties' access to sources of proof[,] the availability of compulsory process[,] and the cost of securing the attendance of witnesses."  *Mercier*, 981 F.2d at 1354.  By contrast, the public interest factors are avoiding "administrative difficulties resulting from court congestion in the plaintiff's chosen forum[,] the 'local interest in having localized controversies decided at home'[,] the interest in having the trial of a case conducted in a forum that is at home with the governing law . . . and the unfairness of imposing jury duty on citizens in an unrelated forum."  *Id.* (quoting *Piper*, 454 U.S. at 241 n.6).

All of the public and private interest factors point to Japan as the most convenient venue for this litigation.  First, nearly all of the individuals and entities involved in this case were in Japan when the alleged fraud took place.  The individuals and entities who were directly or indirectly involved in the relevant events were Takahashi, other Toshiba employees, various employees at PTC-Japan and Transcosmos, and individuals working at GELC-Japan, all of whom were and continue to be located in

17

Japan.  The only relevant party not located in Japan is PTC-US. However, given the stipulation of PTC-US to submit to the jurisdiction of the Japanese courts, it too would be subject to the jurisdiction and compulsory process of Japanese courts.

Second, the alleged fraudulent acts occurred in Japan.  When pressed by me at the hearing, GELC could not identify anyone in the United States who made a misrepresentation that related to the fraud scheme.  The only apparent connection to the United States is that money from PTC-Japan was transmitted from Japan to Massachusetts and PTC-US sent licensing codes from Massachusetts to Japan.  The fact that the major players involved were all in Japan and the alleged fraudulent acts took place in Japan strongly supports the conclusion that Japan is the proper forum for adjudicating this dispute.[7]  *Howe*, 946 F.2d at 951.

Third, the litigation related to the alleged fraud is currently pending in Japan.  Thus, from a judicial efficiency perspective it made and continues to make sense that any additional dimension involvement of PTC-US might bring to the overall controversy proceed in Japan as well.  While judicial efficiency considerations are not determinative, they support Japan as the proper venue.

---

[7] GELC correctly notes that, according to the complaint, the money PTC allegedly acquired as a result of the fraud is located in the United States.  However, given the stipulation of GELC to submit to a judgment rendered against them in Japan, the recovery of such monies is assured to the same degree as if judgment was obtained in the United States.

18

The public and private interest factors strongly favor adjudicating this case in Japan.

### III. CONCLUSION

In the absence of any ripe controversy between the parties concerning the Stipulation, I decline to vacate the Order dismissing this case on *forum non conveniens* grounds and now direct the Clerk to enter a final judgment of dismissal in accordance with this Memorandum and the electronic order of September 30, 2008.


                                    ***/s/ Douglas P. Woodlock***
                                    DOUGLAS P. WOODLOCK
                                    UNITED STATES DISTRICT JUDGE